The undersigned reviewed the prior Opinion and Award based on the record of the proceedings before then Deputy Commissioner Bernadine S. Ballance and the briefs and oral arguments before the Full Commission. The appealing party has not shown good ground to reconsider the evidence, receive further evidence, or to amend the Opinion and Award.
No medical records were submitted, except Defendants' Exhibit (1) and (2) (3 pages) attached to the deposition of Dr. Dalto. Objections raised during deposition testimony were ruled upon according to law.
* * * * * * * * * * * * *
The Full Commission finds as facts and concludes as matters of law the following which were agreed upon by the parties as:
STIPULATIONS
1. At all times relevant to this claim, the parties were subject to and bound by the North Carolina Workers' Compensation Act.
2. At all times relevant to this claim, an employer-employee relationship existed between plaintiff and defendant-employer.
3. The carrier on the risk was Liberty Mutual Insurance Company.
4. The last day plaintiff worked for defendant-employer was 13 May 1992.
5. Plaintiff's average weekly wage was $240.58.
6. The following records concerning plaintiff's employment history are admitted into evidence:
 a. Three pages of records from Centennial Lanes. (Stipulated Exhibit 1)
 b. Three pages of records from the Employment Security Commission. (Stipulated Exhibit 2)
 c. Four pages of records from Publishers Warehouse, Inc. (Stipulated Exhibit 3)
 d. 18 March 1994 letter from Lowe's Companies, Inc. (Stipulated Exhibit 4)
 e. 22 February 1994 letter from Furr's Nursery. (Stipulated Exhibit 5)
* * * * * * * * * * * * * *
The Full Commission adopts the findings of fact found by the Deputy Commissioner as follows:
FINDINGS OF FACT
1. At the time of the hearing in this matter, plaintiff was a forty year old male who left high school in the ninth grade. Plaintiff had been employed by defendant-employer since March, 1990. Defendant-employer operates a hatchery where eggs are incubated and the hatched chicks are shipped to broiler companies. There are no adult birds housed at this hatchery.
2. In May of 1992, plaintiff worked for defendant-employer as a washroom worker. His job duties required him to clean buggies containing chicken droppings or fecal matter, broken eggs that were often dried and hardened, dead chicks and the exposed tissue and parts from dead chicks. This work required that plaintiff use a high pressure water hose and a homemade scraper or chisel to scrape dried feces, eggs and chick tissue from the sides and bottom of the buggies. The cleaning chemicals used were sodium hypochloride or a thenol sterilizing solution. Plaintiff did this type of work every day.
3. Located approximately 100 yards from defendant-employer's premises are several chicken houses. At times plaintiff's job duties required him to assist in the loading of boxes from the chicken houses into storage bins. Plaintiff never actually went into the chicken houses.
4. On 13 May 1992, plaintiff developed flu-like symptoms, his chest began to tighten and he could hardly breathe. Plaintiff's wife drove him to the hospital where he was admitted immediately. Later that day plaintiff became so ill that he was placed on respiratory life support. Plaintiff's symptoms included an atypical type of pneumonia, a rash, headaches, and fever. Plaintiff remained on respiratory life support for four days and in the hospital for approximately two weeks and four days.
5. Plaintiff was treated by Drs. Stephen Hawes and Carmine Dalto. Dr. Hawes is a general physician with a specialty in infectious diseases. Dr. Dalto is one of the physicians at Charlotte Pulmonary Associates and is board certified in internal, pulmonary and critical care medicine.
6. While in the hospital, plaintiff was given a variety of diagnostic tests to determine the exact nature of his illness. After reviewing the results of these tests and obtaining a work and medical history, both physicians at the time of his discharge from the hospital opined that plaintiff had contracted psittacosis associated with his employment. They took into consideration illnesses associated with the type of atypical pneumonia plaintiff had and felt that psittacosis was the most likely diagnosis, given plaintiff's symptoms and work environment. They were unable to produce conclusive proof, however, because the test which would show conclusive proof, a lung biopsy, is impractical to perform due to the nature of the test. It requires the removal of a large piece of lung which would have been life threatening for plaintiff.
7. Dr. Hawes, during deposition testimony, backed away from his original diagnosis of psittacosis and opined that plaintiff might have contracted psittacosis from inhalation of fecal materials.
8. The type of pneumonia that plaintiff had is frequently caused by something that one comes into contact with in their environment. Plaintiff had no history of any significant exposure outside of employment that could have caused this type of pneumonia that he suffered.
9. Dr. Charles Luther Hofacre, Vice President of Health and Quality Assurance at defendant-employer, testified in part as an expert in veterinary medicine and avian disease. He opined that the primary way humans can contract psittacosis is by inhaling or ingesting dried excrement in an environment which contains fecal contamination or fecal dust excreted by an infected bird. He further opined that there was an extremely low possibility that a chick could be born with psittacosis, but admitted that he has had no prior experience with cases of psittacosis in chickens. His testimony was based upon what he had read in the literature.
10. At the time plaintiff was hospitalized, the fact that he was suffering from an atypical pneumonia is uncontroverted. Dr. Dalto and Dr. Hawes' primary concern initially was treatment which required extensive inquiry into the possible causes of this pneumonia. Dr. Dalto narrowed the causes primarily to the following:
 a. Hypersensitivity pneumonia or allergic pneumonia from inhaling fecal materials from chicks,
 b. Fungal disease or infection caused by inhaling high concentrations of bird droppings and fecal dust and,
 c. Psittacosis, a disease caused by inhalation of the disease causing organism from infected bird materials.
The usual causes of pneumonia were also considered and ruled out by Dr. Hawes and Dr. Dalto.
11. Plaintiff was tested for Rocky Mountain Spotted Fever and Legionnaires disease; however, the antibiotics with which plaintiff was treated affected the accuracy of test results and the physical results gathered were inconclusive.
12. Dr. Dalto opined that plaintiff suffered from a most usual pneumonia that is not typically found on the outside in the general population; consequently, just about everything considered had a strong relationship to plaintiff's employment. He further opined that statistically, it is more likely than not that plaintiff's pneumonia was related to his employment.
13. Plaintiff was released to return to work by Dr. Dalto on 12 October 1992; however, he was advised not to return to his former employment. There is no evidence concerning when plaintiff began to look for suitable employment after 12 October 1992. Plaintiff returned to part-time work with Centennial Lanes at an unspecified time.
14. Plaintiff had reached maximum medical improvement at the time of his last visit with Dr. Dalto in February, 1993.
15. Plaintiff's employment either caused or significantly contributed to the development of his atypical pneumonia. Plaintiff's pneumonia which resulted from inhalation of high concentrations of fecal materials, fecal dust and disease causing organisms from decomposed, dead chicks was characteristic of and peculiar to his employment and his employment placed him at a greater risk of contracting said disease than the public in general.
16. Plaintiff was temporarily and totally disabled as a result of his occupational disease from 13 May 1992 through 1 February 1993.
17. Although plaintiff was released to return to work on 12 October 1992, he could not return to his former employment. Defendant-employer made no efforts to assist plaintiff in locating suitable employment. Plaintiff returned to his part-time job with Centennial Lanes working seven to eight hours per day, two days per week at an unspecified time after 12 October 1992. Defendants are entitled to a credit against workers' compensation owed for plaintiff's earnings.
* * * * * * * * * * * * *
Based on the foregoing findings of fact the Full Commission concludes as follows:
CONCLUSIONS OF LAW
1. Although the evidence was inconclusive on the question of whether plaintiff contracted from his employment the scheduled occupational disease called psittacosis, plaintiff did contract from his employment an atypical pneumonia which is an occupational disease within the meaning of. G.S. § 97-53(13).
2. Plaintiff's atypical pneumonia is a disease which is due to causes and conditions which are characteristic of and peculiar to his employment with defendant-employer and is not an ordinary disease of life to which the general public is equally exposed outside the employment. G.S. § 97-53(13); Rutledge v. TultexCorp., 308 N.C. 85, 301 S.E.2d 359 (1983).
3. As a result of his occupational disease, plaintiff was incapable of earning the same or greater wages in the same or any other employment and was therefore disabled from 13 May 1992 through 1 February 1993, the time he reached maximum medical improvement. Plaintiff did earn diminished wages during said period and defendants are entitled to a credit for wages earned against workers' compensation benefits due the plaintiff during each earning period. G.S. § 97-29.
4. Plaintiff is entitled to payment by defendants for all medical treatment necessitated by his occupational disease. G.S. § 97-25.
5. The treatments provided to plaintiff by Presbyterian Hospital, Dr. Stephen Hawes and Dr. Carmine Dalto were reasonably necessary to effect a cure, give relief and to lessen his period of disability and are hereby authorized. G.S. § 97-25.
6. Plaintiff has sustained no permanent or permanent partial impairment resulting from his occupational disease.
* * * * * * * * * * * * *
Based upon the foregoing findings of fact and conclusions of law, the Full Commission affirms the holding of the Deputy Commissioner and enters the following:
AWARD
1. Subject to an attorney's fee hereinafter awarded, defendants shall pay to plaintiff temporary total disability compensation at the rate of $160.47 per week from 13 May 1992 through 1 February 1992, provided, however, defendants shall receive a credit for wages earned by plaintiff during any weekly compensation period.
2. Defendants shall pay for all medical expenses incurred by plaintiff as a result of his occupational disease when bills for same have been submitted to defendants and approved pursuant to procedures established by the Commission.
3. An attorney's fee of twenty-five percent (25%) of the compensation due plaintiff herein is hereby awarded to plaintiff's counsel.
4. Defendants shall pay the costs due this Commission.
This 8th day of September 1995.
 S/ _______________________ THOMAS J. BOLCH COMMISSIONER
CONCURRING:
S/ ______________________ GEORGE T. GLENN II DEPUTY COMMISSIONER
9 October 1995
DISSENTING:
S/ ______________________ J. RANDOLPH WARD COMMISSIONER
Filed Date: 5/1/96